**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**KERMIT L. PRIME, JR., on behalf of the**
**United States of America,**

        **Plaintiff,**

**v.**                                    **Case No:  6:10-cv-1950-Orl-36DAB**

**POST, BUCKLEY, SCHUH & JERNIGAN,**
**INC., and PARSONS CORPORATION,**

        **Defendants.**

_____

## ORDER

    This cause comes before the Court on two motions for summary judgment on Plaintiff Kermit L. Prime, Jr.'s ("Plaintiff") Amended Complaint:  (1) Defendant Parsons Corporation's ("Parsons") Motion for Summary Judgment (Doc. 78); and (2) Defendant Atkins North America, Inc. f/k/a Post, Buckley, Schuh & Jernigan, Inc.'s ("PBS&J") Motion for Summary Judgment (Doc. 79).[1]  Plaintiff filed responses in opposition to each Motion for Summary Judgment (Docs. 84, 85), and Defendants replied in further support of their Motions (Docs. 99, 100).  On May 29, 2013, the Court held a hearing on the Motions for Summary Judgment, and heard argument of counsel for Plaintiff and Defendants.  _See_ Doc. 105.  Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, Defendants' Motions for Summary Judgment will be granted.

_____

[1] Defendants Parsons and PBS&J are collectively referred to as "Defendants."  Defendants' Motions for Summary Judgment are collectively referred to as the "Motions for Summary Judgment."

## I.   BACKGROUND

### A.   Statement of Facts[2]

#### 1.   *The EPJV Proposal*

In June 2001, the United States Army Corps of Engineers ("USACE") submitted a request for proposal seeking an architect-engineering firm to provide private "Program Management Support" for its Comprehensive Everglades Restoration Program ("CERP").  Doc. 92, p. 1.  Because CERP was a "first-of-its-kind effort," the USACE planned to "reduce cost risk by using a fixed-price [Indefinite Delivery/Indefinite Quantity] contract" and issuing individually-negotiated "firm-fixed-price" task orders that would require the contractor to provide services or deliverables within a specified time period for a negotiated price.  *Id.* at 1–2; Doc. 78-3, pp. 3, 6.  This type of fixed-price contract, routinely used by the USACE for architect-engineering design type services, limits the USACE's cost risk and places the responsibility for any profit or loss resulting from performance cost on the contractor.  Doc. 92, p. 2.

In response to the USACE's request for proposal, PBS&J and Parsons formed the Everglades Partnership Joint Venture ("EPJV"), and submitted a detailed proposal to the USACE on August 24, 2001 ("the EPJV Proposal").  *Id.*  Plaintiff, at the time a Senior Vice President with PBS&J, assisted in preparation of the EPJV Proposal.  *See* Doc. 91, ¶ 2; EPJV Proposal, Doc. 78-5, p. 5.  The EPJV Proposal included the EPJV's proposed man-day labor rates for various labor categories (e.g., Project Manager, Engineering Technician, etc.) and provided detailed backup information supporting these rates.  Doc. 92, p. 2.  The EPJV's proposed man-day labor rates were based on the actual salaries of approximately 200 existing employees of

---

[2] As the parties in this case submitted Statements of Undisputed Facts (Docs. 91, 92), the Court cites these documents where facts are undisputed, and otherwise determines facts based on the parties' submissions, affidavits, and deposition testimony.

PBS&J and Parsons, listed by name, that Plaintiff selected to include in the EPJV Proposal, and included overhead costs based on overhead rates for PBS&J and Parsons. *Id.* at 2. At the USACE's request, the EPJV submitted a single proposed blended overhead rate based on a combination of the audited overhead rates for PBS&J's environmental division and Parsons Infrastructure and Technology Group Inc. ("Parsons I&T Group"), a business unit of Parsons. *Id.* at 2–3. The audits of the overhead rates were not conducted contemporaneously with the EPJV Proposal and contract negotiations, but were instead recent audits of both PBS&J's environmental division and Parsons I&T Group, which were accepted by the USACE as current. *Id.* at 3. In connection with the EPJV Proposal, PBS&J and Parsons I&T Group each submitted a Certificate of Current Cost and Pricing Data certifying that, to the best of their knowledge and belief, the cost or pricing data included in the EPJV Proposal was "accurate[,] complete, and current" as of August 23, 2001 (for PBS&J) and August 22, 2001 (for Parsons I&T Group). *Id.*; Certificates of Current Cost or Pricing Data ("Certificates"), Doc. 79-6, pp. 17–19. Plaintiff signed the Certificate of Current Cost and Pricing Data on behalf of PBS&J. *See* Certificate, Doc. 79-6, p. 17.

### 2. Negotiation of the Contract

Before beginning negotiations with the EPJV, the USACE prepared its own "Government Estimates" of daily labor rates that it believed were fair and reasonable, and prepared a Pre-Negotiation Objectives Memorandum outlining the labor rates and overhead rates that it hoped to obtain through negotiations. Doc. 92, p. 3. The Government Estimates and negotiation objectives were based on a comparable government schedule of labor rates and overhead rates for previous contracts of "a similar type [and] scope" between the USACE and other companies. *Id.*

After comparing the EPJV Proposal to its Government Estimates, the USACE concluded that the EPJV's proposed rates were "generally higher than the negotiation objective" because the personnel identified for several disciplines were more senior than the USACE thought necessary. Doc. 91, ¶ 6.  As such, the USACE requested, and the EPJV submitted, a revised proposal ("Revised Proposal") with lower labor rates. *Id.*  The USACE did not request, and the EPJV did not include, a Certificate of Cost and Pricing Data with the Revised Proposal. *Id.*

Following submission of the Revised Proposal, the EPJV and the USACE engaged in two days of formal negotiations, all of which were transcribed, on September 11, 2001 and September 12, 2001. *Id.* at ¶ 7, Doc. 92, p. 4.  Plaintiff served as the EPJV's lead negotiator with the USACE regarding all terms of the contract, including the negotiation of the applicable labor rates and overhead rate. Doc. 92, p. 5.  The USACE rejected the EPJV's proposed labor rates as too high and refused to negotiate based on the proposed labor rates and blended overhead rate included in the Revised Proposal. *Id.* at 4.  Instead, the USACE wanted to negotiate exclusively from historic data it had collected from previous and existing contracts with other firms to achieve fair and reasonable labor rates. *Id.*  Using the labor rates USACE obtained with other contractors as a starting point, the parties discussed in detail, and negotiated on a line item basis, the daily labor rates to be charged by the EPJV for each category of labor. *Id.*  The USACE also rejected the blended overhead rate proposed by the EPJV and proposed a different, lower overhead rate. *Id.*  After negotiating and agreeing upon the applicable labor rates, the EPJV agreed to the USACE's proposed overhead rate. *Id.*  Accordingly, neither the actual overhead rates for PBS&J and Parsons I&T Group, nor the blended overhead rate proposed by the EPJV were used to develop the negotiated daily labor rates. *Id.*; Doc. 91, ¶ 7.

3.      *Formation and Performance of the Contract*

After concluding negotiations, the EPJV entered into a fixed-price indefinite delivery/indefinite quantity Architect-Engineering Contract with the USACE, dated September 20, 2001 (the "Contract"), pursuant to which the USACE hired the EPJV to provide architectural and engineering services related to CERP.  Doc. 92, p. 5; *see* Contract, Docs. 79-17, 79-18, 79-19.  The Contract stated that it was "Fixed Price with an economic price adjustment clause" to account for inflation or deflation, and that work under the Contract would be assigned by "negotiated firm-fixed-price task orders."  *See* Contract, Doc. 79-17, p. 11, Doc. 79-19, pp. 27–28.  The Contract terms were largely an incorporation of certain provisions of the Federal Acquisition Regulations, 48 C.F.R. § 1.000 *et seq.*, which set forth the policies and procedures for acquisitions by all federal executive agencies.  *See* Contract, Doc. 79-17, pp. 13–54, Doc. 79-18, pp. 2–34.  Plaintiff executed the Contract on behalf of the EPJV.  Doc. 91, ¶ 2.

Pursuant to the Contract, the USACE assigned work to the EPJV through individually negotiated firm-fixed-price task orders.  Doc. 92, p. 5.  For each task order, the USACE developed a scope of work, defining its needs for the task order, and prepared a government estimate of the cost to complete the task order.  *Id.*  To prepare the government estimates, the USACE determined the type of labor required to complete the work and multiplied the applicable man-day labor rate—which the parties had negotiated and agreed upon in forming the Contract in September 2001—for each such labor category by the number of days required to complete the work.  *Id.* at 5–6.  After receiving the scope of work from the USACE, the EPJV prepared and submitted a proposal for each task order based on its estimate of the number of days necessary to complete the work multiplied by the applicable man-day labor rates in the Contract.  *Id.* at 6.  The USACE and the EPJV then negotiated a fixed, lump-sum price for each task order, which included a negotiated profit component.  *Id.*  The man-day labor rates in the

Contract were used to negotiate all of the task orders, and the parties did not renegotiate those labor rates in connection with any of the task orders. *Id.* The only items negotiated for the task orders were the type of labor to be provided, the number of man-days required to complete the work, and a specific profit component. *Id.*

The section of the Contract listing the applicable man-day labor rates for each labor category provided: "Prices include Overhead, but not Profit. Profit will be negotiated for Line Items 1001 through 1081 on each individual task order. No profit will be allowed on Line Items 1082 through Line Item 1103." Contract, Doc. 79-18, p. 39. Line Items 1001 through 1081 listed the various labor categories, such as Project Manager, Engineering Technician, etc. *Id.* at 39–42. Line Items 1082 through Line Item 1103 listed items such as printing/reproduction costs, sampling and laboratory costs, and travel costs. *Id.* at 42–43.

During negotiation of the Contract, the USACE representatives acknowledged and agreed that, since the task orders were for a fixed price, the EPJV had the ability to increase its profits beyond the specific profit component negotiated for each task order by performing the required work more efficiently or by "put[ting] lower priced people on there hoping [the EPJV] can get it done cheaper [than the man-day labor rates listed in the Contract]." Transcript of Sept. 12, 2001 Contract Negotiations ("9/12/01 Neg. Tr."), Doc. 78-7, pp. 27:4–7, 32:12–33:15, 46:7–19, 52:7–18, 92:23–93:15. Conversely, the EPJV would be responsible for any losses it sustained as a result of actual labor costs exceeding the task order's projected labor costs. *See id.* Therefore, the EPJV could "either make money or lose money" based on how the EPJV chose to complete the work. *Id.* at 32:12–24.

William Morris and Lois Obenchain, who were among the USACE's representatives during the negotiations, testified that they understood that the EPJV could keep, and did not have

to report to the USACE, any profits resulting from the use of labor that was cheaper than the man-day rates listed in the Contract, just as the EPJV would be responsible for any losses due to cost overruns.   Doc. 92, p. 6; Deposition of William Morris ("Morris Dep."), Doc. 78-4, pp. 124:21–126:1, 140:12–16; 143:16–144:4; Deposition of Lois Obenchain ("Obenchain Dep."), Doc. 96, pp. 23:1–22, 103:3–6, 117:1–20.   Charles Padera, a PBS&J employee who served as Deputy Program Manager and later Program Manager of the EPJV, testified that the USACE never requested or discussed with the EPJV the actual profit earned in connection with the performance of the task orders.  Doc. 91, ¶ 10.  Following execution of the Contract, the USACE did not request, nor did the EPJV provide, any Certificates of Current Cost and Pricing Data in connection with any task orders.  *Id.* at ¶ 11.

Upon completion of a task order, the EPJV would submit an invoice for payment to the USACE, which would review the invoice, "spot check" the deliverable to ensure task order requirements were met, and send the invoice to accounting for processing and payment.  *Id.* at ¶ 12.  The USACE never questioned or disapproved any invoice submitted in connection with the Contract, and paid the invoices aware that the amounts included raw salary rates for individuals working under the Contract and overhead for the EPJV.  *Id.*  The USACE did not request and the EPJV did not submit any Certificates of Current Cost and Pricing Data with invoices for payment under any task order.  *Id.* at ¶ 11.

The EPJV itself had no employees but staffed CERP with employees of PBS&J and Parsons.  *Id.* at ¶ 8.  Additional employees were hired to perform the Contract following a review of resumes that Plaintiff provided.  *Id.*  Plaintiff approved all salary rates for all new hires, including salaries with daily rates lower than the corresponding negotiated man-day rates in the Contract.  *Id.*  The Contract did not require use of any specifically-named individuals.  *Id.* at ¶ 9.

Nor did anything in the Contract require payment of any particular salary to individuals within any specified labor classifications.  *Id.*  Other than changes implemented through the Contract's economic price adjustment clause, the man-day labor rates remained the same for the duration of performance under the Contract.  *Id.* at ¶ 13.  Ms. Obenchain testified that, due to the fixed-price nature of the Contract, the EPJV was not permitted to propose any man-day rates other than those included in the Contract.  *Id.*

The EPJV performed task orders under the Contract for the agreed-upon three-year base period, and the USACE renewed the contract in 2004, 2007, and 2009 by exercising the first three three-year option periods provided for in the Contract.  *Id.* at ¶ 12.  With each renewal, the USACE reported that an "informal analysis of prices indicates that the option price is better than prices available in the market."  *Id.*  The USACE did not require and the EPJV did not submit any Certificates of Current Cost and Pricing Data to the USACE in connection with the renewals.  *Id.*  The decision to exercise the option periods was unilaterally made by the USACE, without any proposal or submission from the EPJV.  Doc. 92, pp. 6–7.  The USACE consistently rated the EPJV's performance as outstanding or satisfactory.  *Id.* at 7.

### 4.    *Plaintiff's Employment*

Plaintiff began employment with PBS&J in 1997 as the division manager responsible for the Orlando profit center and, over the course of approximately twelve years, Plaintiff's employment transitioned to include responsibility for multiple divisions and regions.  Doc. 91, ¶ 14.  Plaintiff served as a Senior Vice President at the time of his termination in May 2009.  *Id.*

Plaintiff served on the EPJV Management Committee and timely received all financial statements related to the EPJV and "kept track" of its financial performance, as he remained "responsible for that division."  *Id.* at ¶ 15.  Plaintiff testified that he first learned of the EPJV's actual profits on the Contract as early as 2002.  *Id.*  He believed that the EPJV's profits should

have been between approximately eight to ten percent as provided for by the specific profit components in each task order, but he learned that the EPJV's actual profits were over 30 percent due to its use of lower-cost labor than the man-day rates listed in the Contract.  Deposition of Kermit L. Prime, Jr. ("Prime Dep."), Doc. 95, 100:3–101:14.  According to Plaintiff, this issue began to arise as soon as the EPJV "got the notice to proceed" in 2001.  Doc. 91, ¶ 16.  Plaintiff believed it was problematic that the "vast majority of the EPJV staff" was hired after execution of the Contract, "when the rates were known," and that the staff was hired "for less than the rates used in negotiating the man-day rates."  *Id*.  He characterized the issue as a "big deal" but did not raise his concerns with anyone at the EPJV or PBS&J until June 2008.  *Id.* at ¶¶ 16, 17; Prime Dep., Doc. 95, 101:8–14.

In June 2008, nearly seven years after he negotiated and signed the Contract, Plaintiff discussed with PBS&J's President, Robert Paulsen, that he "felt" the EPJV was misleading the USACE as to profit rates and asked whether PBS&J had overcharged the USACE under the Contract.  Doc. 91, ¶ 17.  This discussion followed Plaintiff's receipt of a memorandum from Mr. Paulsen to PBS&J's employees which stated that, as a U.S. Government contractor, PBS&J was required to use current, accurate, and complete information in its dealings with the USACE. *Id.*; Prime Dep., Doc. 95, 101:15–102:3, 103:15–104:1.  Plaintiff expressed to Mr. Paulsen his concern about whether the EPJV was "in compliance" with the requirements set forth in the memorandum.  Doc. 91, ¶ 17.  Mr. Paulsen told Plaintiff that he would have someone look into Plaintiff's concerns and asked Lourdes Fernandez, an employee in accounting involved with the Contract, to look into the matter.  Declaration of Robert Paulsen ("Paulsen Dec."), Doc. 79-32, ¶¶ 2–3.  Ms. Fernandez investigated the matter and reported her findings to PBS&J's Chief Financial Officer, Don Vrana, who agreed with her conclusion that no overcharging had

occurred.  *Id.* at ¶ 3.  Ms. Fernandez then informed Mr. Paulsen, who relayed the information to Plaintiff in a subsequent meeting.[3]  *Id*; Prime Dep., Doc. 95, 30:5–31:9.  Plaintiff testified that Mr. Paulsen told him that he "wasn't to ever bring it up again."  Prime Dep., Doc. 95, 31:5–6.

Shortly thereafter, Plaintiff was re-assigned as a "marketer," despite his belief that he was ill-suited for the position, and his bonus and salary were "greatly reduced."  *Id.* at 17:11–14, 24:8–25:17, 31:12–32:1.  He was also "demoted" below Larry Hentz, who he had previously supervised.  *Id.* at 16:2–17:9.  On May 19, 2009, Plaintiff was laid off by PBS&J.  Doc. 91, ¶ 18. Mr. Hentz testified that he made the decision to terminate Plaintiff's employment due to a "lack of work" available to Plaintiff.  Declaration of Lawrence H. Hentz, Jr. ("Hentz Dec."), Doc. 79-33, ¶ 3.  In Mr. Hentz's view, Plaintiff "was not achieving his sales and productivity objectives and he was not producing work sufficient to keep him employed by [PBS&J], particularly given the difficult economy at that time."  *Id*.  Mr. Hentz testified that he made the decision to lay off Plaintiff based solely on Plaintiff's performance and the lack of work, and that he was not asked by anyone at PSB&J to lay off Plaintiff.  *Id.* at ¶ 4.  Mr. Paulsen testified that he was not involved in the decision to terminate Plaintiff, and that he did not send any messages to Mr. Hentz that Plaintiff should be terminated for raising the overbilling issues.  Paulsen Dec., Doc. 79-32, ¶ 4.  PBS&J issued a Notice of Personnel Action which stated that the type of termination was a "lay-off" due to a "lack of work," and that PBS&J would be willing to re-hire Plaintiff. Doc. 79-34, p. 2.

---

[3] The timing of this second meeting is unclear due to inconsistencies in the evidence submitted by Plaintiff.  In his deposition, Plaintiff initially testified that the second meeting occurred "a couple of weeks" after the first meeting in June 2008.  Prime Dep., Doc. 95, 30:5–9.  When PBS&J's counsel pointed out that the Amended Complaint stated that the second meeting occurred in early 2009, Plaintiff admitted that he did not recall when the second meeting occurred.  *Id.* at 30:10–14.  In his affidavit, Plaintiff stated that the second meeting occurred in early 2009.  *See* Prime Aff., Doc. 86-1, ¶ 25.

Following his lay-off, Plaintiff expressed anger about his termination and said it turned him from an "asset" into a "terrorist" against the company, and that he was now a "very strong negative asset." *See* Email Chain from Jeanette Rodriguez to Robert Paulsen, June 8, 2009, Doc. 79-35.  Plaintiff testified that he used this terminology because he was angry that PBS&J "had screwed up [his] employment compensation."  Prime Dep., Doc. 95, 189:1–21.

**B.    Procedural History**

On December 30, 2010, Plaintiff filed a *qui tam* Complaint asserting two causes of action:  (1) Count I - Violations of the False Claims Act (the "FCA"), 31 U.S.C. § 3729 *et seq.*, against both Defendants; and (2) Count II - Wrongful Termination under the FCA, 31 U.S.C. § 3730(h), against PBS&J.  Doc. 1.  On November 30, 2011, the Government notified the Court that it was declining its statutory right to intervene in the action.  *See* Doc. 2.

Both Defendants filed a motion to dismiss the Complaint.  *See* Docs. 24, 25.  The Court denied PBS&J's motion to dismiss, but granted Parsons' motion to dismiss and dismissed the Complaint solely as to Parsons.  *See* Docs. 51, 52.  Thereafter, Plaintiff filed an Amended Complaint alleging the same Counts as the original Complaint.  *See* Doc. 56.  On October 11, 2012, Parsons filed a motion to dismiss the Amended Complaint.  Doc. 62.  On January 3, 2013, Defendants filed their Motions for Summary Judgment.  Docs. 78, 79.

On May 29, 2013, the Court held a hearing on the motions.  *See* Doc. 105.  At the hearing, the Court entered an Oral Order denying Parsons' motion to dismiss, and taking under advisement the pending Motions for Summary Judgment.[4]  *See* Doc. 106.

---

[4] At the hearing, the Court also denied Plaintiff's motion to dismiss counterclaims filed by PBS&J.  *See* Doc. 106.  PBS&J's counterclaims are not addressed in this Order.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]"  Fed. R. Civ. P. 56(c)(2).  Issues of facts are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.*  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).

## III.     DISCUSSION

### A.     False Claims

In Count I, Plaintiff alleges that Defendants made false claims and statements to the Government in violation of the FCA by failing to disclose the profits they earned through the use of cheaper labor than the man-day labor rates listed in the Contract.[5]  *See* Doc. 56, pp. 5–8, 10–11.  In their Motions for Summary Judgment, Defendants argue that they did not submit, and the

---

[5] In Count I, Plaintiff also alleged that Defendants violated the FCA by charging indirect labor costs to the EPJV.  *See* Doc. 56, pp. 8–9, 10–11.  However, Plaintiff has conceded that Defendants are entitled to partial summary judgment on this claim.  *See* Doc. 84, p. 10 n.7; Doc. 85, p. 8 n.3.

Contract did not require, any "certifications" under the FCA. *See* Docs. 78, 79. Moreover, they argue that, because the Contract was a fixed-price contract, they were entitled to keep, and did not have to report, any profits earned by reducing labor costs. *See id.* In response, Plaintiff contends that the invoices submitted by Defendants were "implied certifications" of compliance with the terms of the Contract prohibiting profits on the man-day labor rates (other than the specific profit components negotiated for each task order). *See* Docs. 84, 85. Because the Court concludes that, even under an implied certification theory, Plaintiff has failed to establish that Defendants made a "false" claim or statement, Defendants' Motions for Summary Judgment will be granted as to Count I.

The FCA is "the primary law on which the federal government relies to recover losses caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). The FCA permits private citizens to bring *qui tam* suits to enforce its provisions. *See* 31 U.S.C. § 3730(b). Plaintiff's claim relating to the alleged man-day labor rate fraud is based on the following three subsections of the FCA:[6]

> [A]ny person who--
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> …
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

---

[6] The Fraud Enforcement and Recovery Act of 2009 ("FERA") amended and renumbered sections of the FCA relevant to this action. *See* FERA, Pub. L. No. 111-21, 123 Stat. 1617. In their memoranda, the parties alternately refer to the pre- and post-amendment versions of the FCA. *See, e.g.*, Doc. 78, p. 15 n.4; Doc. 84, p. 8 n.3. Because the outcome would be the same regardless of which version of the FCA applies, the Court refers to the post-amendment version for convenience.

> Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government. . . .

31 U.S.C. § 3729(a)(1); *see* Doc. 84, pp. 8, 18; Doc. 85, pp. 8, 17.   Regardless of which subsection Plaintiff relies upon, to prevail on his man-day labor rate fraud claim, Plaintiff must establish that Defendants made a "false" claim or statement.  *See United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (stating that a false record or statement is an element of a claim under § 3729(a)(1)(G)); *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009) ("We have repeatedly held that the submission of a false claim is the '*sine qua non* of a False Claims Act violation.'   Improper practices standing alone are insufficient to state a claim under either § 3729(a)(1)[(A)] or [(B)] absent allegations that a specific fraudulent claim was in fact submitted to the government.").

The courts have recognized several different ways that a claim may be considered "false" under the FCA:

> There are two categories of false claims under the FCA: a factually false claim and a legally false claim.   A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment.   A legally false FCA claim is based on a "false certification" theory of liability.
>
> . . .
>
> There is a further division of categories of claims as the courts have recognized that there are two types of false certifications, express and implied.   Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. There is a more expansive version of the express false certification theory called "implied false certification" liability which attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment.   Thus, an implied false certification theory of liability is premised on the notion that the act of

> submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment.

*United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (internal citations and quotations omitted).

In this case, Plaintiff seeks to hold Defendants liable under an implied false certification theory, arguing that the invoices submitted by Defendants were "implied certifications" of compliance with the terms of the Contract prohibiting profits on the man-day labor rates (other than the specific profit components negotiated for each task order). *See* Doc. 84, pp. 10–11; Doc. 85, pp. 8–9. Plaintiff contends that the Eleventh Circuit adopted the implied false certification theory of liability in *McNutt*. *See* Doc. 84, p. 16; Doc. 85, p. 15.

In *McNutt*, the defendant medical providers entered into a Medicare provider agreement with the Government, certifying that they would comply with all laws and regulations concerning proper practices for Medicare providers, including the Anti-Kickback Statute. 423 F.3d at 1258. Under the agreement, compliance with the Anti-Kickback Statute was a condition for receipt of payments from the Medicare program. *Id*. The plaintiff brought a *qui tam* action under the FCA and the Government intervened, alleging that the defendants paid kickbacks to doctors and pharmacists in exchange for referrals of Medicare patients to the defendants. *Id*. The Government argued that the claims for Medicare reimbursement submitted by the defendants as a result of these kickbacks were false claims in violation of the FCA because the defendants knew that they were not in compliance with the Anti-Kickback Statute. *Id*. The defendants moved to dismiss the complaint, contending that their certification on the Medicare enrollment agreement that they would comply with the Anti-Kickback Statute, and their subsequent violation of that Statute, did not constitute a false claim under the FCA. *Id*. at 1259. On appeal, the Eleventh Circuit disagreed and held that the Government had properly stated a

claim under the FCA, concluding that the "violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed make the claims false. . . ." *Id.*; *see Wilkins*, 659 F.3d at 306 (citing *McNutt* for the proposition that the Eleventh Circuit has joined the majority of courts of appeals in recognizing implied false certification liability).

Even under an implied false certification theory, however, Plaintiff has failed to establish that Defendants made "false" claims or statements under the FCA, because he has not demonstrated a violation of the terms of the Contract or the incorporated Federal Acquisition Regulations. The Contract was for a fixed price with an economic adjustment clause, with work under the Contract to be assigned by "negotiated firm-fixed-price task orders."[7]  *See* Contract, Doc. 79-17, p. 11.  As the Eleventh Circuit has explained, "[a] pure fixed price contract requires the contractor to furnish the goods or services for a fixed amount of compensation regardless of the costs of performance, thereby placing the risk of incurring unforeseen costs of performance on the contractor.  In a fixed price contract, if the final total costs of the agreed upon services exceed the contracted price, the contractor takes the loss; conversely, he can profit if the costs are lower than the contract price."  *S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Florida, Inc.*, 365 F. App'x 202, 203 (11th Cir. 2010) (internal citations and quotations omitted); *see* 48

---

[7]  At the hearing on the Motions for Summary Judgment, Plaintiff's counsel disputed the characterization of the Contract as a fixed-price contract, arguing that it was instead "some type of hybrid."  *See* Unofficial Transcript, p. 56.  Plaintiff's assertion, however, directly contradicts his admissions in the Joint Statements of Undisputed Facts.  *See* Doc. 91, ¶ 8; Doc. 92, p. 5.  The Supreme Court has held that a party's argument that contradicts a stipulation entered in a joint statement of facts need not be considered.  *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2983 (2010) ("[Factual stipulations are] binding and conclusive . . . and the facts stated are not subject to subsequent variation.  So, the parties will not be permitted to deny the truth of the facts stated . . . or to maintain a contention contrary to the agreed statement. . . .").  Therefore, Plaintiff is bound by his admission that the Contract was a fixed-price contract.  In any event, the plain language of the Contract makes it clear that it was for a fixed price.  *See* Contract, Doc. 79-17, p. 11.

C.F.R. § 16.202–1 ("A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.").

In *Empire Blue Cross & Blue Shield v. United States*, the United States Court of Federal Claims (formerly the United States Claims Court) addressed whether a Government contractor could be held liable for increasing profits through the use of labor at a lower cost than that specified in the contract. 26 Cl. Ct. 1393, 1394 (Cl. Ct. 1992), *aff'd*, 5 F.3d 1506 (Fed. Cir. 1993). There, the contractor entered into a contract with the Government to serve as a Medicare intermediary for New York State. *Id.* at 1395. The contract was for a fixed price and allowed for economic price adjustments. *Id.* During performance of the contract, the contractor requested and received several economic price adjustments due to the increased cost of labor. *Id.* During a subsequent audit of these adjustments, the Government's contracting officer discovered that the contractor's labor costs had actually *decreased*, because the contractor had reduced its staffing levels from 337 employees to 302 employees, well short of the 433 employees listed in the estimated costs section of the contract and accompanied by a Certificate of Current Cost or Pricing Data. *Id.* As a result, the contracting officer requested that the contractor remit the amount that it received for the increased labor costs. *Id.* The contractor brought an action under the Contract Disputes Act, which allows a contractor to bring an action to resolve claims by the Government against a contractor, and the Government filed a counterclaim, demanding remittance of the amount paid. *Id.* at 1394. Both parties moved for summary judgment, and the Claims Court ruled in favor of the contractor, explaining:

> [The contract] involved a commitment on [the contractor's] part to undertake, for
> a fixed price, all work of a certain character, and of an estimated quantity. Thus,

had the accomplishment of that work required a larger staff than the number on which [the contractor's] bid was based, no additional compensation would have been forthcoming from the Government because the risk of a cost miscalculation of that sort was inherent in the fixed price nature of the undertaking. [The contractor] would have had to absorb the loss. By the same token, however, the accomplishment of the work with fewer personnel than initially thought necessary becomes a circumstance that inures exclusively to [the contractor's] benefit. Savings in estimated costs realized by a contractor during performance of the base contract work give the Government no reprieve from the obligation to pay more for extra work.

*Id.* at 1396 (internal citations omitted).

Although *Empire Blue Cross* was a case decided under the Contract Disputes Act, and not the FCA, its principles are equally applicable to FCA claims. Indeed, Government contractors in a fixed-price contract are not liable under the FCA for failing to notify the Government that the work could be performed less expensively and charged at a lower price. *See United States ex rel. Wilkins v. N. Am. Constr. Corp.*, 173 F. Supp. 2d 601, 635 (S.D. Tex. 2001) (rejecting the Government's argument that the contractor "should have told the government that it could have performed the work of drilling and waste management less expensively and could have charged the government a lower price"); *Sterling Millwrights, Inc. v. United States*, 26 Cl. Ct. 49, 101 (Cl. Ct. 1992) ("[T]he mere fact that an activity may be accomplished less expensively in a fixed-price contract falls measurably short of fraud under the False Claims Act.").

Here, the man-day labor rates in the Contract were set at fixed rates. Therefore, the Government knew, or should have known, that Defendants would reap the benefits of any cost savings, just as they would suffer the consequences of any cost increases. The Government's knowledge of this possibility is supported by the transcript of the Contract negotiations, as well

as the testimony of the USACE representatives who negotiated the Contract.[8]  *See* 9/12/01 Neg. Tr., Doc. 78-7, pp. 27:4–7, 32:12–33:15, 46:7–19, 52:7–18, 92:23–93:15; Doc. 92, p. 6; Morris Dep., Doc. 78-4, pp. 124:21–126:1, 140:12–16; 143:16–144:4; Obenchain Dep., Doc. 96, pp. 23:1–22, 103:3–6, 117:1–20.

Moreover, the flaws in Plaintiff's argument are exposed when the converse of the current situation is examined.  If the EPJV's labor costs had increased beyond the rates listed in the Contract, it is clear that the EPJV would not have been permitted to obtain higher pay-outs from the Government, as this was exactly the type of cost risk the Government was seeking to avoid by entering into a fixed-price contract.  *See* Doc. 92, p. 1.  Prohibiting the EPJV from retaining profits obtained through the use of cheaper labor would be inconsistent with the purpose behind the Contract and fixed-price contracts in general.  Furthermore, the Contract did not require the use of specifically-named persons, *see* Doc. 91, ¶ 9, and therefore the changing of personnel and the corresponding labor costs to the EPJV were to be expected over the life of the Contract. Plaintiff has failed to point to any provision in the Federal Acquisition Regulations or the Contract requiring the EPJV to notify the Government when it changed personnel or their corresponding costs.  Without the showing of a violation of the Federal Acquisition Regulations or the Contract, Plaintiff cannot establish the existence of a false claim or statement under the FCA.  *See McNutt*, 423 F.3d at 1259.  As no genuine issues of material fact exist, the Court will grant Defendants' Motion for Summary Judgment as to Count I.

---

[8] Plaintiff argues that the Contract is unambiguous in prohibiting profits on the man-day labor rates aside from the specific profit components negotiated for each task order and, therefore, parol evidence is inadmissible to explain its terms.  *See* Doc. 84, pp. 6–8; Doc. 85, pp. 6–8; *Lab. Corp. of Am. v. McKown*, 829 So. 2d 311, 313 (Fla. 5th Dist. Ct. App. 2002).  The Court finds that the Contract is ambiguous as to whether a subsequent decrease in labor costs may result in additional savings to the EPJV.  Accordingly, parol evidence is admissible to explain the Contract terms.

B.      **Wrongful Termination**

In Count II, Plaintiff alleges that PBS&J violated the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h), by terminating his employment in retaliation for his expressed concerns regarding possible overbilling by the EPJV. *See* Doc. 56, pp. 9–10, 12.  In its Motion for Summary Judgment, PBS&J argues that Plaintiff has failed to establish either that he was engaged in protected conduct or that PBS&J retaliated against him on the basis of that protected conduct. *See* Doc. 79, pp. 21–23.  Plaintiff contends that there is sufficient circumstantial evidence for a reasonable jury to find that he was terminated in retaliation for his comments to Mr. Paulsen. *See* Doc. 85, pp. 18–19.

The anti-retaliation provision of the FCA in effect at the time of Plaintiff's termination provided:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2008), *amended by* FERA, Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624–25 (2009).[9]  The Eleventh Circuit has explained that a plaintiff seeking relief under this provision must show that: (1) the employee was engaged in protected conduct; and (2) the employer retaliated against the employee because of that protected conduct. *Mack v. Augusta-Richmond County, Georgia*, 148 F. App'x 894, 896–97 (11th Cir. 2005).

---

[9] The 2009 FERA amendments to the anti-retaliation provision only apply to conduct on or after May 20, 2009. *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 n.5 (11th Cir. 2010).  Plaintiff was terminated on May 19, 2009.  Doc. 91, ¶ 18.

### 1.      Protected Conduct

The pre-FERA version of the FCA's anti-retaliation provision protected an employee's conduct "in furtherance" of an "action filed or to be filed" under the FCA.  *See* 31 U.S.C. § 3730(h) (2008); *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1313 (M.D. Ala. 1999).  The Eleventh Circuit has held that the protections of the anti-retaliation provision apply not only where an FCA claim is actually filed, "but also where the filing of such an action, by either the employee or the government, was 'a distinct possibility' at the time [of the allegedly protected conduct]."  *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996); *see Sanchez*, 596 F.3d at 1303–04 (applying the "distinct possibility" test); *Mack*, 148 F. App'x at 897 (same).  Because Plaintiff's FCA claim was not actually filed until December 2010, the Court must determine whether there was a "distinct possibility" of Plaintiff filing an FCA claim when he first voiced his concerns over potential overbilling to Mr. Paulsen in June 2008.  In determining whether there was a "distinct possibility" that Plaintiff would file an FCA claim at that time, the Court must consider:

> Whether the employee engaged in conduct from which a factfinder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud. . . .  Under this approach, the court will look for evidence that the plaintiff, either by words or actions, communicated to the employer that she believed that the employer had engaged in illegal or fraudulent conduct involving submission of claims for payment to the government.  Such a showing could be made, for example, by evidence that the plaintiff characterized the employer's conduct as illegal or fraudulent or recommended that legal counsel become involved.

*Mann*, 49 F. Supp. 2d at 1314.

Courts have found a "distinct possibility" of litigation where the employee (1) made internal reports to the employer characterizing the employer's conduct as illegal or fraudulent, (2) recommended that legal counsel become involved, or (3) reported the conduct to the

Government.  *See Sanchez*, 596 F.3d at 1303 (finding a "distinct possibility" of litigation where the employee complained about her employer's "unlawful actions" and warned her supervisors that they were "incurring significant criminal and civil liability"); *Mann*, 49 F. Supp. 2d at 1315–16 (finding a "distinct possibility" of litigation where the employee reported fraudulent conduct to the employer's in-house legal department, participated in the decision to fire an employee who engaged in fraudulent conduct, and contacted support personnel for assistance in explaining pertinent Medicare regulations to her supervisor); *see also Childree*, 92 F.3d at 1146 (finding a "distinct possibility" of litigation where the employee provided extensive information about her employer's fraudulent billing to a Government official and later testified about the fraudulent billing at a Government hearing).  On the other hand, courts have recognized that the mere internal reporting of wrongdoing or mischarging, without more, is not sufficient to establish a "distinct possibility" of litigation.  *See Sanchez*, 596 F.3d at 1303 (acknowledging cases from the Fourth and Sixth Circuits requiring more than the mere reporting of wrongdoing or mischarging); *Mack*, 148 F. App'x at 897 (finding that e-mails sent by the employee to his supervisors expressing concerns about compliance with federal bidding regulations did not raise the "distinct possibility" of an FCA claim); *United States ex rel. Carpenter v. S & K Technologies, Inc.*, No. 5:08-CV-287, 2011 WL 3664415, at *13 (M.D. Ga. Aug. 19, 2011) (finding no "distinct possibility" of an FCA claim because "protected activity must concern the employee's investigation into more than his employer's non-compliance with federal or state regulations").

Here, the Court cannot conclude that Plaintiff's discussion with Mr. Paulsen would have reasonably led PBS&J to fear that there was a "distinct possibility" of an FCA claim.  The evidence shows that in June 2008, Plaintiff told Mr. Paulsen that he "felt" the EPJV was

misleading the USACE as to profit rates and asked whether PBS&J had overcharged the USACE under the Contract.  Doc. 91, ¶ 17.  Plaintiff expressed to Mr. Paulsen his concern about whether the EPJV was "in compliance" with the requirements set forth in the memorandum circulated to PBS&J's employees.  *Id*.  However, there is no evidence that Plaintiff characterized the alleged overbilling as unlawful or fraudulent.  Nor is there evidence that Plaintiff attempted to involve legal representatives or contact USACE officials regarding the alleged overbilling.  Instead, Plaintiff engaged in precisely the sort of internal reporting of wrongdoing or mischarging which courts have found fails to raise a "distinct possibility" of litigation.  *See Sanchez*, 596 F.3d at 1303; *Mack*, 148 F. App'x at 897; *Carpenter*, 2011 WL 3664415, at *13.

Moreover, there is no evidence that Mr. Hentz, who made the decision to terminate Plaintiff, even knew about Plaintiff's discussions with Mr. Paulsen.  To the contrary, the evidence suggests that Mr. Hentz did not know about the discussions.  *See* Paulsen Dec., Doc. 79-32, ¶ 4; Hentz Dec., Doc. 79-33, ¶¶ 3–4.  Where the decision-making authority who terminates an employee is not aware of the allegedly protected conduct, it cannot be said that the employer was on notice of the distinct possibility of an FCA claim.  *See Mack*, 148 F. App'x at 897 (finding that the employer did not have notice of the distinct possibility of an FCA claim where there was no evidence that the decision-making authority was aware of the allegedly protected conduct).  However, as the Court has explained, even if Plaintiff's discussions with Mr. Paulsen were brought to the attention of Mr. Hentz, that fact would not provide a reasonable basis from which to conclude that PBS&J was on notice of the distinct possibility of an FCA claim.  *See id*.  Accordingly, Plaintiff's discussions with Mr. Paulsen were not protected conduct under the anti-retaliation provision of the FCA.

2.     *Causal Connection*

Even if the Court were to find that Plaintiff engaged in protected conduct under the FCA, he would still have to demonstrate a causal connection between the protected conduct and the adverse employment action he experienced.  *See id.* at 896–97; *Mann*, 49 F. Supp. 2d at 1316. To prove a causal connection, a plaintiff may either present direct evidence of retaliatory intent or raise, by indirect evidence, an inference of retaliation.  *Mann*, 49 F. Supp. 2d at 1316. Plaintiff concedes that he has no direct evidence of retaliatory intent.  *See* Prime Dep., Doc. 95, 20:5–21:13, 29:3–18.    Rather, Plaintiff argues that the temporal proximity between his discussions with Mr. Paulsen and his termination is circumstantial evidence of retaliation.  *See* Doc. 85, pp. 18–19.

When a plaintiff seeks to prove his case with circumstantial evidence, the plaintiff has the initial burden of establishing a prima facie case under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Carpenter*, 2011 WL 3664415, at *11; *Mann*, 49 F. Supp. 2d at 1316.  Under this framework:

> [t]o establish a prima facie case of retaliation, a plaintiff must prove that (1) the employer is covered by the act at issue, (2) the employee engaged in protected activity, (3) the employee suffered adverse action, and (4) there is an inference of causation between the protected activity and the adverse action.  A prima facie case of retaliation raises a presumption that the employer is liable to the employee, and the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action.  The burden then returns to the plaintiff to prove that the employer's reasons are pretextual.  The employee can meet this burden either directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence.  If the proffered reason is one that might have motivated a reasonable employer, the employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Carpenter*, 2011 WL 3664415, at *11–12 (internal citations and quotations omitted).

24

The Court first addresses whether Plaintiff has established a prima facie case of retaliation.  It is undisputed that PBS&J, as a U.S. Government contractor, is covered by the FCA.  As to the second part of the prima facie inquiry, the Court has already held that Plaintiff was not engaged in protected activity under the FCA.  *See supra*, Part III.B.1.  For this reason alone, Plaintiff cannot prevail on his FCA retaliation claim.  Nevertheless, in an abundance of caution, the Court will proceed with the prima facie inquiry as if Plaintiff had engaged in protected activity.  As to the third part of the inquiry, it is undisputed that Plaintiff suffered adverse employment action.  However, the Court must first clarify exactly what that adverse action was.  It is clear that Plaintiff's termination in June 2009 was an adverse action.  In his response to PBS&J's Motion for Summary Judgment, Plaintiff also discusses his re-assignment to the Marketing Division when supporting his anti-retaliation claim.  *See* Doc. 85, pp. 18–19.  However, in his Amended Complaint, Plaintiff does not even mention his re-assignment, but instead states that his termination was the alleged retaliatory action.  *See* Doc. 56, p. 12.  Moreover, at the hearing on the Motions for Summary Judgment, Plaintiff's counsel explained that the adverse action was the termination.  *See* Unofficial Transcript, p. 44.  Therefore, the Court will treat only Plaintiff's termination in June 2009, and not the re-assignment, as the adverse action.

Turning to the fourth part of Plaintiff's prima facie case, he must establish an inference of causation between his discussions with Mr. Paulsen and his termination.  *See Carpenter*, 2011 WL 3664415, at *11.  To do this, Plaintiff "must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff."  As explained in Part III.B.1, *supra*, Plaintiff has failed to present any evidence that Mr. Hentz, who made the decision to terminate Plaintiff, knew about Plaintiff's

discussions with Mr. Paulsen, and indeed, the evidence is to the contrary.  Because Plaintiff has failed to establish that the ultimate terminating authority, Mr. Hentz, had knowledge of the allegedly protected conduct, he cannot make a prima facie case of retaliation.  *See Mack*, 148 F. App'x at 897.

Moreover, Plaintiff's argument is based entirely on the temporal proximity between his discussions with Mr. Paulsen and his termination in May 2009.  *See* Doc. 85, pp. 18–19.  Indeed, Plaintiff's affidavit states that "[b]ecause of the temporal proximity between my follow up conversation with Mr. Paulsen in early 2009, and my transfer, which I viewed as a *de facto* demotion, I believe that my termination by PBS&J was in retaliation for the concerns which I expressed over potential mischarges and overbillings to [the USACE]."  Prime Aff., Doc. 86-1, ¶ 27.  However, due to inconsistencies in the evidence submitted by Plaintiff, it is unclear whether his discussions with Mr. Paulsen occurred in June 2008, early 2009, or some time in between. *See supra*, n. 3.  At a minimum, the lag between the discussions and his termination appears to span approximately four months.  *See* Unofficial Transcript, p. 45.  However, "mere temporal proximity, without more, must be 'very close.'  A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *see also Carpenter*, 2011 WL 3664415, at *12.  Thus, in the absence of other evidence tending to show causation, the lag of four to five months between Plaintiff's discussions with Mr. Paulsen and his termination is insufficient to create a genuine issue of material fact, and Plaintiff's retaliation claim fails as a matter of law.  *See Thomas*, 506 F.3d at 1364.

Even assuming *arguendo* that Plaintiff established a prima facie case of retaliation, that would merely shift the burden to PBS&J to proffer a legitimate, non-retaliatory reason for terminating him.  Here, PBS&J has met this burden of production, submitting evidence that Mr. Hentz made the decision to lay off Plaintiff due to a "lack of work."  Hentz Dec., Doc. 79-33, ¶ 3.  Mr. Hentz indicated that Plaintiff "was not achieving his sales and productivity objectives and he was not producing work sufficient to keep him employed by [PBS&J], particularly given the difficult economy at that time."  *Id*.  Indeed, the Notice of Personnel Action states that the type of termination was a "lay-off" due to a "lack of work," and that PBS&J would be willing to re-hire Plaintiff.  Doc. 79-34, p. 2.  Thus, PBS&J has offered ample evidence of a legitimate, non-retaliatory reason for Plaintiff's termination, thereby shifting the burden back to Plaintiff to prove that PBS&J's proffered reason is pretextual.

To survive summary judgment, Plaintiff must meet his burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carpenter*, 2011 WL 3664415, at *12 (internal citations and quotations omitted).  For many of the same reasons discussed with respect to his prima facie case, Plaintiff fails under either method.  As explained previously, Plaintiff has failed to offer sufficient evidence of a "very close" temporal proximity to establish a causal connection between these actions.  Even if he had, there is the additional deficiency of his failure to establish Mr. Hentz's knowledge of the allegedly protected conduct, which proves fatal to his claim.

In arguing that PBS&J's proffered reason for terminating him is pretextual, Plaintiff points to evidence which, in his view, demonstrates that he was a well-regarded employee.  *See* Doc. 85, p. 19 (citing Docs. 85-3, 85-4, 85-5).  The first piece of evidence is deposition

testimony from John Shearer, a former supervisor of Plaintiff at PBS&J, who testified that between 2001 and Mr. Shearer's departure from PBS&J in 2007, Plaintiff was an "outstanding employee."  Doc. 85-3, 40:3–6.  The second piece of evidence is a letter dated September 28, 2004, from Mr. Padera, who had been working under Plaintiff's supervision at PBS&J, to Plaintiff.  Doc. 85-24, p. 3.  In the letter, Mr. Padera thanked Plaintiff for his guidance and acknowledged that he appreciated working under Plaintiff's direction.  *Id*.  The third piece of evidence is deposition testimony from Scott DeLoach, who supervised Plaintiff at PBS&J.  *See* Doc. 85-5.  Mr. DeLoach testified that between 2001 and his departure from PBS&J in 2005, he believed that Plaintiff's job performance was "outstanding."  *Id.* at 30:9–15.  However, the foregoing evidence reflects co-workers' opinions of Plaintiff's job performance only as of 2007, 2004, and 2005, respectively.  Plaintiff was not terminated until May 2009.  Therefore, the evidence provides little support for his assertion that PBS&J's proffered reason for terminating him is pretextual.  Moreover, the mere fact that he was, at least at one time, a well-regarded employee does not mean that he would be immune from layoffs, particularly in a difficult economic period where there was a lack of available work.  Thus, Plaintiff has failed to demonstrate that a discriminatory reason more likely motivated PBS&J than its proffered justification of lack of work.

Nor has Plaintiff shown that PBS&J's proffered reason is unworthy of credence.  Mr. Hentz's testimony that Plaintiff was laid off due to a lack of work is supported by the Notice of Personnel Action, which stated that Plaintiff was laid off due to a lack of work, and that PBS&J would be willing to re-hire Plaintiff.  The fact that PBS&J documented that it would be willing to re-hire Plaintiff indicates that the termination was indeed based on a lack of work during a difficult economic period, as a company would likely be unwilling to re-hire an employee who

was fired for the very reason that he was reporting misconduct.  Therefore, Plaintiff fails to meet his burden of showing that PBS&J's proffered reason was mere pretext, and PBS&J is entitled to summary judgment on Plaintiff's FCA retaliation claim.[10]

## IV.    CONCLUSION

For the aforementioned reasons, the Court will grant Defendants' Motions for Summary Judgment, as no genuine issues of material fact exist and there is an absence of evidence to support the causes of action in Plaintiff's Amended Complaint.  Defendants are entitled to judgment in their favor as a matter of law.

Accordingly, it is hereby **ORDERED** and **ADJUDGED:**

1.    Defendant Parsons Corporation's Motion for Summary Judgment (Doc. 78) is **GRANTED**.

2.    Defendant Atkins North America, Inc. f/k/a Post, Buckley, Schuh & Jernigan, Inc.'s Motion for Summary Judgment (Doc. 79) is **GRANTED**.

3.    The Clerk is directed to terminate Defendant Parsons Corporation from this action.

4.    A Final Pretrial Conference will be scheduled as to Defendant Atkins North America, Inc. f/k/a Post, Buckley, Schuh & Jernigan, Inc.'s counterclaims.

5.    A final summary judgment will be entered at the conclusion of this litigation.

---

[10] Because the Court finds that Defendants are entitled to summary judgment on both Counts in the Amended Complaint, the Court need not address PBS&J's arguments that Plaintiff's claims are barred by the statute of limitations and by a previous settlement agreement with the Government.  *See* Doc. 79, pp. 23–26.

**DONE** and **ORDERED** in Orlando, Florida on August 23, 2013.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties